## AFFIDAVIT OF MAHMOOD AHMAD, M.D.

I, Mahmood Ahmad, M.D. hereby state on oath the following:

1. I am a physician licensed to practice medicine in the states of Arkansas, Alaska, and Indiana. I obtained a pain medicine fellowship at Yale University and I am a diplomat of the American Board of Anesthesiology, sub-specialty certification in pain medicine. I am also a Fellow with the Australian and New Zealand College of Anesthetists.

2. On August 7, 2009, I went before the Arkansas State Medical Board to request permission to dispense legend drugs pursuant to A.C.A. § 17-95-102(d). The reason for requesting permission was simple. I wanted to help my patients by having the ability to not only treat them but also to dispense their medications at point-of care. That way, I could explain the functions and risks of the medication and ensure that compliance and refills were handled in an appropriate manner. The Board denied my request. (See attached Exhibit "3b9"). From that point on, I was prohibited by Arkansas law from dispensing any type of legend drugs (including controlled substances) in my office or, for that matter, in any other office or setting. In other words, I was legally unable to dispense legend drugs in Arkansas without jeopardizing my license to practice medicine.

3. Due to the fact that my reasons for requesting a permit to dispense legend drugs were real and substantial, I decided to have a fully licensed pharmacy adjacent to my pain clinic, *i.e.*, United Pain Care. We formed United Pain Care, Ltd., a Sub-Chapter S Corporation, which was owned by myself and my wife (50/50) to operate my pain clinic. However, my wife had no knowledge or experience with the day to day operations of the corporation. The pharmacy operated as a separate corporate division of United Pain Care, Ltd.

4. The pharmacy had nothing to do with the medical care of patients. Its sole purpose was to provide pharmacy services. United Pain Care, Ltd. had its own separate


GOVERNMENT EXHIBIT 2

software, paperwork, phone, fax, e-mail and website. United Pain Care, Ltd. also had its own staff which had no overlap in responsibilities with the medical clinic.

5. United Pain Care, Ltd. was managed exclusively by a pharmacist. In the beginning, the pharmacist was an independent contractor. When we went before the Pharmacy Board on January 27, 2010, we submitted an application that stated that the applicant was Carla Garrison, a licensed pharmacist and that listed me as the pharmacy owner. However, the "Pharmacist in Charge" was clearly stated to be Carla M. Garrison. On April 27, 2010, the Pharmacy Board issued Retail Pharmacy License Permit No. 047719 to Ms. Garrison. (See attached Exhibit "B").

6. On October 12, 2011, Ms. Garrison was replaced by Ms. Pamela Hastings West as the pharmacist-in-charge. Thereafter, Retail Pharmacy License Permit No. AR2627 was issued on November 8, 2011 which reflected that Ms. West, was the pharmacist-in-charge. Ms. West resigned on May 15, 2012 and the pharmacy remained closed until on or about July 2, 2012. (See attached Exhibit "C"). On July 3. 2012, the Pharmacy Board was sent a change of pharmacist in charge form stating that Albert Rinchuso would be the new pharmacist-in-charge in place of Pamela Hastings West. Before we went before the Pharmacy Board in connection with the change of pharmacist-in-charge, we filed an application for the fictitious name of United Pharmacy for United Pain Care, Ltd. This was done on October 10, 2012. (See attached Exhibit "D").

7. When I went before the Pharmacy Board to apply for a retail pharmacy license permit, the Pharmacy Board specifically told me not to enter the pharmacy without the pharmacist being present. I fully complied with that directive.

8. In January of 2013, United Pharmacy sued Cardinal Health for wrongfully cutting off the supply of controlled substances to United Pharmacy. As a product of the suit, Albert Rinchuso signed an affidavit.

2

9. In July of 2013, I sold United Pharmacy to Albert Rinchuso. Mr. Rinchuso closed the pharmacy on his own in May of 2014 and took off without paying me anything for the pharmacy he had purchased.

10. While United Pharmacy was a division of United Pain Care, Ltd., and before the pharmacy was sold to Mr. Rinchuso, I did not dispense a single legend drug or cause any of my medical clinic staff to dispense legend drugs. All of the drugs were dispensed by the pharmacist-in-charge. Furthermore, I did not operate the pharmacy. I was busy caring for my medical clinic patients. Again, I ordered no controlled substances; I handled no controlled substances; I did not verify, count, reconcile, return or destroy any medications, including controlled substances. I had no authority or responsibility for maintaining the pharmacy's controlled substance records. Finally, the DEA Registration (No. FU2008313) was in the name of United Pharmacy during the entire time we owned the company. (See attached Exhibit "1"). Assuming for the purpose of this affidavit that there were indeed record keeping violations, I was in no position to prevent or correct the violations because I had no knowledge of their existence or of the record keeping requirements. That was always the responsibility of the Pharmacist-in-Charge.

Further the affiant sayeth not.

_____
MAHMOOD AHMAD, M.D.

3

STATE OF ARKANSAS      )
                       )   ss
COUNTY OF PULASKI      )

Subscribed and sworn to, before me, a Notary Public, this 1st day of October, 2015.

_____
NOTARY PUBLIC

My Commission Expires: 2-6-2019

**Shortway, Kendall B.**

| | |
|---|---|
| From: | Mahmood Ahmad <drahmad@unitedpaincare.com> |
| Sent: | Friday, May 24, 2013 7:02 AM |
| To: | Shortway, Kendall B. |
| Cc: | rx@unitedpharmacyrx.com |
| Subject: | Pharmacy Audit |

Dear Kendall,

I mentioned during our meeting that I do not manage the pharmacy as I do not have professional qualifications of a pharmacist. However, being the owner of the pharmacy, any violations which are assessed against the pharmacy are ultimately applicable to the company (which I own) since the pharmacist is an employee.

Due to this scenario, I have to get involved in the audit process. Therefore, after you left I sat down with Andy to identify the possible causes of the mismatch in the numbers. The cycle is as follows

1. Order is placed and a 222 Form is generated
2. Order is received and noted on the 222 Form
3. Quantities received are added into the Rx 30 software
4. Quantities dispensed are automatically deducted from the Rx 30 software
5. Quantities on the shelf must match the balance in the software report
6. All generics must be grouped together for the drug name/type/strength regardless of NDC

Andy mentioned during our meeting yesterday that he has to use different NDC combinations when filling scripts because of the limited stock he has available. After Andy does that he updates quantities against the NDC so that he would know what is left. However, while doing that he does not adjust the NDC which was short. In other words the dispensing occurred from a single NDC whereas a combination of physical NDC's was used. This is the reason for mismatch of numbers. Andy performed this action in "good faith" however, this action caused the overage in stock which is a "virtual overage" not a "physical overage".

In order to test this hypothesis and have a fair assessment of physical and reported counts we have to do the following prospective audit

1. Examine the current "displayed" quantities of the counts in each generic drug/strength category
2. Capture the screens and make a total of all NDC's for each category
3. Do a physical count of the inventory
4. Input the physical amount of the inventory in the software
5. Capture the screens again and make a total of all NDC's for each category
6. The difference between 2 and 5 is our existing error between the virtual count and physical count
7. From that date onwards we will only "add" new stock received
8. From that date onwards we will not adjust any NDC regardless of the combination of NDC's used for any dispensing episode
9. After a 4 week period we match the software count added, dispensed and remaining for each category
10. If the remaining physical count matches the remaining software count, then the prol

1



If there is an incidence where medications are spilled or there was a counting error those would be recorded separately. They will not be entered into the system.

I hope this is an acceptable scenario to give a fair chance to me as non-pharmacist owner and also to Andy who as not trained in the computer age and the Rx 30 software was a completely new software for him. Furthermore, the outgoing pharmacist Pamela West did not provide him an in-service and did not cooperate with Andy. The learning process has occurred "on the go" and the "do's and dont's" on the software was never taught to Andy.

--
Sincerely


**Dr. Mahmood Ahmad**
*Pain Medicine Fellowship - Yale University*
*Diplomate - American Board of Anesthesiology*
*Subspecialty Certification in Pain Medicine*
*Fellow - Australian & New Zealand College of Anaesthetists*