IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DISTRICT

UNITED STATES OF AMERICA                                                                     PLAINTIFF

vs.                                       No. 4:15cv-181 JM

MAHMOOD AHMAD, M.D., et al and
UNITED PAIN CARE, LTD. d/b/a
UNITED PHARMACY                                                                                DEFENDANTS

## ORDER

This is an action brought by the government against Defendants for violations of the Controlled Substances Act ("CSA"), 21 U.S.C. §801 *et seq.* occurring from January 27, 2012 through May 30, 2013. A jury found that Defendant United Pain Care, Ltd., d/b/a United Pharmacy ("UPC") had violated §842(a)(5) of the CSA.[1] Specifically, the jury found that UPC failed to maintain one accurate DEA-222 Order Form for Schedule II controlled substances, failed to maintain or keep two separate DEA-222 Order forms documenting receipt of Schedule II controlled substances, failed to maintain accurate dispensing and receiving records for the controlled substances[2], and failed to properly annotate 101 separate invoices for controlled substances by noting the date the controlled substances were received. On April 26, 2017, the day following the jury trial, evidence was presented to the Court for consideration in its determination of the amount of penalties to be assessed against UPC. Pursuant to 21 U.S.C.A. §842(c), the civil penalty for each of these §842(a)(5) violations cannot exceed $10,000 per violation.

The Court can consider a number of factors in determining the amount of civil penalties

---

[1] The jury found that Defendant Mahmood Ahmad, M.D. did not dispense, deliver, or otherwise dispose of controlled substances; he, therefore, had no liability as charged.
[2] Alprazolam (.5mg and 2 mg), oxycodone (10mg/650), hydrocodone (10 mg/650; 7.5 mg/500; and 5 mg/500), buprenorphine (8 mg), Lyrica (75 mg), Carisoprodal (350 mg) and lorazepam (2mg).

to assess, including: (1) the level of defendant's culpability, (2) the public harm caused by the violations, (3) defendant's profits from the violations, and (4) defendant's ability to pay a penalty. *Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377, 399–400 (2d Cir. 2004); *United States v. Glob. Distributors, Inc.*, 498 F.3d 613, 620 (7th Cir. 2007).

The Court heard evidence from DEA investigator John Conner regarding a computation chart that was created during the audit and inspection of UPC. This chart shows that there were 4,010 hyrdocodone pills unaccounted for, representing the difference between UPC's records and its inventory. It was uncontested that the street value for this number of hydrocodone pills is $28,000. The government questioned the legitimacy of a doctor, especially one with a pain management practice, owning a pharmacy. Mr. Conner testified that this situation would eliminate some of the safeguards in place to ensure the legitimacy of a prescription.

Dr. Roman also testified that having the prescribing doctor also own the pharmacy takes off a layer of protection built in to prevent the diversion and abuse of opiates. He testified that in reviewing some of the prescriptions that were written by Dr. Ahmad and filled by UPC, these prescriptions should have been highly suspicious to a pharmacist in the quantity of narcotics and in the combination of narcotic with muscle relaxers or benzodiazepines. The government's evidence proved that many of the prescriptions written by Dr. Ahmad and filled by UPC should have raised red flags for over prescription and diversion of controlled substances.

Dr. Ahmad testified that UPC owned the real estate that the pharmacy was built on, the building, and the inventory in the pharmacy during the time of the violations. After the initial surprise audit on April 17, 2013, Dr. Ahmad requested a subsequent audit in an effort to demonstrate compliance with the CSA from the date of the firs audit, April 17, 2013, through May 30, 2013. This second audit, however, also revealed record keeping violations. The

pharmacy's profit and loss statement for the year ending in December of 2012 shows the gross total profit for UPC to be $209,176; and the profit and loss statement for the year ending 2013 shows the gross total profit to be $151,989. Dr. Ahmad transferred UPC to another doctor on November 9, 2016, after his medical license was revoked, but no money changed hands. The pharmacy had been closed for about two years and there was no inventory. The transfer included the building he bought (purchase date unknown) for $500,000 and any furniture and equipment that was still left in the building. At the time he transferred UPC, the United States had a $1.2 million dollar lien against the building. Dr. Ahmad guessed that the current monthly profit of UPC, which he no longer owned, was about $500 per month ($4,500 in rental income less expenses). There was no evidence that UPC made money from any of the record keeping violations the jury found the pharmacy responsible for or that the diversion of narcotics actually occurred.

Tthe evidence does not support a finding that UPC willfully refused to maintain the records as required. Dr. Ahmad made contact with the DEA after the surprise audit and showed an acceptance of responsibility on behalf of UPC, and his efforts to correct the violations appeared to be sincere. While a second audit conducted at Dr. Ahmad's request to demonstrate UPC's compliance with the CSA also revealed record-keeping violations, the continued violations indicate continued error but do not, to the Court, indicate a willful disregard of the CSA requirements.

However, UPC failed to react to the red flags identified by Mr. Conner and Dr. Roman by reporting the apparent and obvious overprescription of narcotics and narcotics prescribed in combination with benzodiazepines and muscle relaxers. These drugs, and these combinations of drugs, pose a risk of severe harm to the public. Both the shortages that were revealed (4,010

hydrocodone pills) and the excessive numbers of controlled substances with high abuse potential demonstrate that UPC subjected the public to significant harm through the possible (and likely) illegal diversion of controlled substances.

Regarding the issue of UPC's profit from the record-keeping violations, the government established UPC's gross profits for the years ending 2012 and 2013 as $209,176 and $151,989, respectively and argues that these are the relevant figures for the determination of monetary penalties under *Advance Pharmaceutical*. However, the Second Circuit in *Advance Pharmaceutical* only held that the district court's reliance on gross profits rather than net profits was not an abuse of discretion—not that was the standard by which a district court should weigh this factor. The Court finds that there is insufficient proof that the gross profits of UPC for 2012 and 2013 were earned as the result of the CSA violations.

Finally, very little evidence was submitted regarding UPC's ability to pay a monetary fine. The Court finds that the pharmacy is still in business, albeit under a different owner, and is currently, by Dr. Ahmad's estimate, earning a net profit of approximately $500 per month. This small but continued income stream indicates that UPC has the ability to pay a civil monetary penalty.

After consideration of the above factors, the Court is going to award civil penalties against UPC for its record-keeping violations in the total amount of $33,050, representing the street value of the 4,010 missing hydrocodone pills ($28,000) and an additional $50 for each of the 101 failure-to-annotate violations. While this amount is well below the maximum the Court could impose, it reflects the seriousness of the harm to the public in conjunction with the limited ability of UPC to pay a monetary fine based on the evidence presented.

Therefore, judgment will be entered against UPC in the amount of $33,050 civil monetary penalty imposed for its violations of the CSA.

IT IS SO ORDERED this 14th day of June, 2017.

_____
UNITED STATES DISTRICT JUDGE