|  |  |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | EASTERN DISTRICT OF ARKANSAS WESTERN DIVISION |

3  UNITED STATES OF AMERICA,
        Plaintiff,
4    v.                                  No. 4:15CV00181 JM

5                                         April 24, 2017
   UNITED PAIN CARE, LTD.                 Little Rock, Arkansas
6  d/b/a UNITED PHARMACY
   and MAHMOOD AHMAD, M.D.,
7       Defendants,
        v.
8
   PAMELA HASTINGS WEST and
9  ALBERT RINCHUSO,
        Third-Party Defendants.
10
                **EXCERPTED TRANSCRIPT OF TRIAL**
11                **[TESTIMONY OF ALBERT RINCHUSO]**
              BEFORE THE HONORABLE JAMES M. MOODY JR.,
12             UNITED STATES DISTRICT JUDGE, and a jury

13  APPEARANCES:

14  On Behalf of the Government:

15      MS. JAMIE GOSS DEMPSEY, Assistant U.S. Attorney
        MS. SHANNON S. SMITH, Assistant U.S. Attorney
16        United States Attorney's Office
          Eastern District of Arkansas
17        425 West Capitol Avenue, Suite 500
          Post Office Box 1229
18        Little Rock, Arkansas  72203-1229

19  On Behalf of the Defendants:

20      MR. TIMOTHY O. DUDLEY, Attorney at Law
          114 South Pulaski Street
21        Little Rock, Arkansas  72201

22  On Behalf of Third-Party Defendant Albert Rinchuso:

23      MR. MARK F. HAMPTON, Attorney at Law
          1122 West Capitol Avenue
24        Little Rock, Arkansas  72201

25     Proceedings reported by machine stenography; transcript
   prepared utilizing computer-aided transcription.


                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter

1       [Testimony of Albert Rinchuso excerpted from jury trial
2  proceedings held on April 24, 2017, as follows:]
3           **ALBERT RINCHUSO, DEFENDANTS' WITNESS, DULY SWORN**
4                         DIRECT EXAMINATION
5  BY MR. DUDLEY:
6  Q.   State your name, please, sir.
7  A.   Legal name, Albert Rinchuso, but I go by Andy.
8  Q.   And where do you live?  What city do you live in?
9  A.   I live in Little Rock.
10 Q.   And what's your occupation?
11 A.   Pharmacist.
12 Q.   Tell us about your education.  Where did you go to
13 undergraduate school?
14 A.   Well, I grew up in Pine Bluff, and drove four years back
15 and forth from Pine Bluff to Little Rock to UALR.
16          MS. SMITH:  Your Honor, could we approach very
17 quickly?
18          THE COURT:  Sure.
19     (Bench conference held as follows:)
20          MS. SMITH:  I just wanted to make sure he is aware not
21 to mention the indemnification.  And Mark wasn't sure if he was
22 clear on that before he took the stand.
23          MR. DUDLEY:  I talked to him, so I can't tell the
24 Court -- we can have --
25          MS. SMITH:  Sorry?  If he just wants to step down for

1   a moment --
2           MR. DUDLEY:  I can have Mark tell him that.
3           THE COURT:  Why don't y'all have a quick conversation
4   with Mr. Hampton real quick just to make sure we don't wade off
5   into the deep end of the pool?
6           (Proceedings continuing in open court as follows:)
7           MR. DUDLEY:  Mark, do you want to take him outside to
8   do that?
9           (Off the record.)
10          MR. DUDLEY:  Your Honor, have you got some hand
11  warmers?
12          THE COURT:  I can get you a shawl, Mr. Dudley, if you
13  would like, a rocking chair and a shawl.
14          Have a seat.
15  BY MR. DUDLEY:
16  Q.  All right.  When did you graduate from undergraduate
17  school?
18  A.  Where, or when?
19  Q.  When?
20  A.  1981, UALR.
21  Q.  And I assume you went to pharmacy school?
22  A.  Immediately.
23  Q.  Where did you go to pharmacy school?
24  A.  UAMS College of Pharmacy.
25  Q.  How long is that program?

1  A.   Well, when I went, it was three years.  Now it's four.
2  Q.   I assume you successfully completed that?
3  A.   Yes.
4  Q.   And then were you licensed as a pharmacist?
5  A.   Yes.
6  Q.   Is that like the law where you have to go pass a bar exam?
7  You've got to go pass an exam to get a license?
8  A.   Yes.  I got a degree in pharmacy, but then I had to take
9  the NAPLEX, National Association Boards of Pharmacy, and I
10 passed it, and then the State Board of Pharmacy licensed me as
11 a pharmacist.
12 Q.   All right.  And since that time have you worked as a
13 pharmacist?
14 A.   30 years.
15 Q.   All right.  I'm not going to ask you to tell me about your
16 whole career, but I just want to talk to you about when you
17 worked at United Pharmacy.
18 A.   Okay.
19 Q.   Do you recall about when you started at United Pharmacy?
20 A.   July 2nd, 2012.
21 Q.   And I don't know very much about pharmacists and I don't
22 know that the jurors would either.  Give us a general overview
23 of what a pharmacist does.
24 A.   Well, pharmacy has changed since I graduated in '85.
25 Basically what we did was fill prescriptions, count, lick, and

1  stick, and get the medicine out.  And I know pharmacists who
2  have never talked to patients.  And in the last ten, 12 years,
3  pharmacists are required to counsel.  So they have taken the
4  load of filling prescriptions off of us to technicians.  They
5  do the entering, processing, and get the bottle off the shelf,
6  count it.  And then we get it and check it, electronically the
7  pills are pictured -- the prescription shows on the screen, and
8  we check it and then we go counsel the patient on how to take
9  their medicine.
10 Q.   And I assume that your recordkeeping requirements, at
11 least for drugs that are somewhat controlled, are fairly
12 strict?
13 A.   Yes, they are.
14 Q.   And when you worked at United Pharmacy, were you in charge
15 of keeping the records for controlled substances?
16 A.   I was in charge of everything.  I was a one man show.
17 Q.   Tell me -- or tell the jury -- and, again, you don't have
18 to get into a lot of detail, we may get into more detail
19 later -- but give us kind of a thumbnail of how you kept
20 records for controlled substances.
21 A.   Well, when I'm -- first of all, I want to explain, the two
22 years I was there, I had very limited amounts of Class IIs.
23 Most of them that I got were III, IVs, and Vs.  I would say
24 90 percent.  Near the end, the last four or five months, I had
25 been dealing with a couple of wholesalers who knew me, the

1  account reps knew me personally, and so they let me have a few
2  bottles of oxycodone.  In a regular pharmacy, that might last,
3  you know, two weeks, three weeks.  And when I would get those
4  three bottles, they would be gone in two patients.  So I didn't
5  have many invoices for C-IIs.  They were mostly IIIs, IVs, and
6  Vs.  And I would order -- and all of my wholesalers that I
7  had -- because Cardinal Health had cut the pharmacy off before
8  I got there.  All of the wholesalers that I had, they were
9  smaller.  I can tell you who they were.  GenSource -- Top RX
10 out of Memphis, GenSource out of Chicago.  They didn't have --
11 they weren't huge like Cardinal Health.  So I didn't have
12 access to a computer to order drugs.  And then everything was
13 online where, when you got it in, it was automatically updated.
14 I had to do this manually.
15 Q.   Let's go through it then.
16 A.   Okay.  I would call them before 4 o'clock in the afternoon
17 and say, "I need five bottles of hydrocodone, three bottles of
18 Valium, and, you know, five bottles of Xanax, two or three
19 bottles of Soma, carisoprodol."
20 Q.   Would you have to follow that up with either something in
21 writing, an email or something --
22 A.   I didn't understand what you said.
23 Q.   Would you have to follow up the phone call with some
24 paperwork?
25 A.   No.

1  Q.   Email, anything?

2  A.   No.

3  Q.   Okay. So you just ordered over the phone?

4  A.   I would call and talk to the guy one-on-one and tell him
5  what I needed. And the very next day they would be air-shipped
6  to me and I would get them the next day. And I would open the
7  box, and there would be an invoice in there. I would take the
8  invoice out and check for the -- to make sure the drugs were
9  there off the invoice. And I would -- after I saw they were
10 there, if I weren't -- wasn't busy, if Dr. Ahmad's patients
11 wouldn't start coming over there, then I would enter the
12 bottles into the computer for the inventory. I had to manually
13 enter those in. And then I would put them on the shelf.

14      And I -- believe it or not, in 30 years, I have never had
15 to do this kind of paperwork. The technicians do that.
16 Walgreens, all the busy pharmacies -- the pharmacists, we're
17 there to help patients. And the technicians would get the
18 drugs out of the box and they would check the invoices.

19      Well, I didn't know the rules and regulations. And I knew
20 the drugs came in. If they didn't, I would have called the
21 wholesaler and said, "You shorted me." But I matched it. I
22 just didn't check it off and I didn't sign it and I didn't date
23 it. The date was already on the invoice. It came in because
24 they date the invoice the day that you receive it -- the day
25 that you're going to receive it. And then I would file it in a

1  filing cabinet because you have to keep those for, I'm
2  positive, almost -- I think you have to keep invoices for ten
3  years.  And I had them in the filing cabinet.  So I knew where
4  they were.  And I knew I got the drugs.  And I put them on the
5  shelf.
6  Q.  So you would always check the --
7  A.  Yeah.
8  Q.  -- order to make sure that you got what you had ordered?
9  A.  Yeah.  I would never open a box up and just throw the
10 things on there and just blindly say, "Well, I got them all,"
11 and put them on the shelf.  I would always check the invoice
12 with the drugs because I knew what I needed.  And then if I
13 didn't get it in, then I would call the wholesaler, talk to the
14 rep, and tell him, "Hey, you shorted me."  But that never
15 happened.  I always got what I ordered.
16 Q.  All right.  Now, were your records kept on a computer?
17 A.  When you're talking about records, are you talking about
18 inventory?
19 Q.  Well, right now I just want to talk about controlled
20 substance records.
21 A.  Well, yeah, inventory, controlled substance, I would have
22 to manually enter them in there.  And the reason why I bring
23 that up is because if we had had an account with Cardinal
24 before I got there, any time you order from a big wholesaler
25 like McKesson or Cardinal, when the drugs come in, they have --

1   their computers are hooked to the pharmacy's computers.  So
2   when the drugs came in, you never had to -- nobody, the
3   technicians, the pharmacists -- they would automatically update
4   the inventory.
5   Q.   All right.  You had to do it manually?
6   A.   I had --
7   Q.   Did you do that?
8   A.   Yes, I did it.
9   Q.   So even if -- even if you didn't sign and date an
10  invoice --
11  A.   I put -- I put --
12  Q.   -- that information was in your system accurately?
13  A.   Yes, that I know of.  I mean, some days -- there was a few
14  days I was busy.  And if I sat here and said I'm 100 percent
15  sure I added those drugs into that computer manually, I -- I --
16  I was -- I did it 99 percent of the time.  I can't -- I mean, I
17  might have made a mistake and forgot to put them in there once
18  or -- but --
19  Q.   I'm not asking you to vouch that you did it 100 percent of
20  the time.  That was what you tried to do?
21  A.   Yes.  Yes.  I -- that's what I did.  I entered them in
22  there myself in the inventory, in the computer.
23  Q.   All right.  In January of 2013 did you have a burglary at
24  the pharmacy?
25  A.   Yes.  It was Martin Luther King weekend.

1  Q.  Tell the jury what happened.
2  A.  Well, it was a three-day weekend. And, you know, it's a
3  small pharmacy. And all of the controlled substances were on
4  a -- like a cart. And I would roll that cart into a room no
5  bigger than a closet like in your home, little, itty-bitty
6  closet. Nobody knew those drugs were in there. That's where I
7  locked them up every night. We had a security system where if
8  somebody came into the pharmacy, the alarm would go off, the
9  Sherwood police would be over there in five minutes.
10      That weekend, I don't know if it was Friday -- I'm
11 assuming it was at nighttime, Friday, Saturday, or Sunday --
12 maybe Monday night because Martin Luther King day we were not
13 there. I came in Tuesday morning at 10 minutes to 8:00, opened
14 the -- walked in the building, walked into the pharmacy, and,
15 of course, the closet door was still locked. Took my key,
16 opened the door, went to grab -- get the rack to bring them
17 back out in the pharmacy, and the rack was empty. Everything
18 had been stolen.
19      And I immediately went over there and told Dr. Ahmad and
20 his assistant, Sherrie, "There's been a break-in. I have to
21 call the Health Department, State Board of Pharmacy, and find
22 out what to do."
23      So I called the State Board of Pharmacy -- I think I
24 called them first, called the Health Department, and I called
25 the DEA. And within about two hours, Kendall Shortway and Lisa

1   Barnhill showed up.  And they looked the pharmacy over.  And we
2   went into the closet and there was a big gigantic hole in the
3   wall from the outside.  Somebody had taken a drill, a saw,
4   power saw, whatever, and had drilled a complete hole in the
5   wall going into the closet, and about -- I could have crawled
6   through that hole.  It was probably -- I'm thinking an adult --
7   the thing that bothered me about that is nobody, no patient,
8   would ever know where I put those drugs at night.  And it made
9   me think somebody -- somebody either hanging around the
10  building -- you know, I don't want to accuse anybody, but I
11  think it was an inside job because the odds of drilling a hole
12  into a closet where they knew the drugs were, pretty slim if
13  it's a patient.
14       So I filled out all the paperwork.  And I was at the mercy
15  of the computer.  I mean, all the drugs were gone, so --
16  Q.   Let me back up.  Did you report that to the police?
17  A.   Yes.  I called the Sherwood police.  That was the
18  fourth -- yeah.
19  Q.   They came out and take a report?
20  A.   They came out and looked, too.
21  Q.   And did you, as a result of that, have to report to the
22  DEA --
23  A.   Yes.
24  Q.   -- the burglary had occurred?
25  A.   Yes.

1  Q.   And did you -- let me show you what's been introduced as
2  Government's Exhibit 7.  Is this the report that you completed?
3  A.   That's the one I filled out.
4  Q.   All right.  And it contains the list of the drugs that
5  were stolen?
6  A.   Yes.  Those -- those quantities came off the computer.
7  There was no way I could -- 8,270 hydrocodone 5/500, they were
8  gone.  Zero.  All of them were gone.  So I had to go by what I
9  had as the quantity on the computer, the inventory quantity.
10 So that's where those quantities came from.  Everything was
11 stolen.
12 Q.   Okay.  Now, this was about -- I don't know -- two and a
13 half months before the audit?
14 A.   Yeah.
15 Q.   The audit was in April if I remember right?
16 A.   Yes, sir.
17 Q.   Did the DEA ever come back to you after that audit and say
18 that they thought there was 4,000 hydrocodone pills missing?
19 A.   No, nobody ever came back and told me anything.
20 Q.   Do you think that's possible that you were missing 4,000
21 hydrocodone pills?
22 A.   No.  I'll swear right now, there is no way 4,000
23 hydrocodone went out of that pharmacy.  Not even 100 went out
24 of that pharmacy.  I watched -- I counted those -- all of the
25 controls pill by pill.  I watched them like a hawk.

1  Q.   Do you have any explanation then on how she came up with
2  there were 4,000 hydrocodone pills missing?
3  A.   Well, the only explanation that I can think of is that
4  burglary, and I didn't have the right quantities for that
5  particular drug.  And looking at the discrepancies, it looks
6  like I didn't have the quantities correctly on some other ones,
7  but it didn't show a shortage.
8  Q.   Are you familiar with the way pharmacists practice
9  pharmacy?
10 A.   Yes, sir.
11 Q.   Are you familiar with what's standard practice and what
12 they do and don't do?
13 A.   I'm totally 100 percent sure.  I --
14 Q.   Under the circumstances that you practiced in that
15 pharmacy, did you comply with the standards that a normal --
16 A.   Yes.
17 Q.   -- pharmacist would comply with?
18 A.   Yes, sir.
19 Q.   Thank you, sir.
20                         CROSS-EXAMINATION
21 BY MS. DEMPSEY:
22 Q.   Good afternoon, Mr. Rinchuso.
23 A.   Afternoon.
24 Q.   So Dr. Ahmad hired you in July 2012, correct?
25 A.   July 2nd, 2012.

1   Q.   And he was your boss?
2   A.   He was my boss.
3   Q.   When you were working for Dr. Ahmad as the pharmacist, did
4   you have a close relationship with him?
5   A.   I mean, what's a close relationship?
6   Q.   Did you talk every day?
7   A.   Oh, yeah.  Yes.  I went over to his office and filled him
8   in on -- if something was important, then we talked about it.
9   But I didn't go over there every day.  But if I had a
10  problem -- yeah, we had a close relationship.
11  Q.   You wouldn't say that you talked to him every day?
12  A.   There was some days I didn't.
13  Q.   But you had a close relationship --
14  A.   Yes.
15  Q.   -- when things were going on in the business --
16  A.   Yes.
17  Q.   -- you discussed it?  Would you agree with me that Dr.
18  Ahmad wrote the majority of the prescriptions filled at United
19  Pharmacy?
20  A.   Yes.  I had -- I had put banners and flu shot signs and
21  different things trying to make it a regular retail pharmacy.
22  And I had probably 30 patients that didn't even come to him.
23  They came in because of who I was.
24  Q.   And would you agree with me that, according to DEA,
25  diversion of controlled substances could occur when only one

1  practitioner is writing most of the prescriptions at a
2  pharmacy?
3  A.   Explain that, diversion.
4  Q.   Is it likely for a diversion to occur when one
5  practitioner is writing the majority of the prescriptions at a
6  pharmacy?
7  A.   I don't agree with that.
8  Q.   Do you recall testifying at a hearing in the case with
9  Cardinal?
10 A.   Yeah.
11 Q.   Okay.  And that was on about January 31st of 2013?
12 A.   Yes, somewhere around that.
13 Q.   And just to go back real quickly, I want to go back and
14 talk to you just a little about what you just said about your
15 relationship.  Do you recall being asked the question -- or I'm
16 sorry.  If you look on line 25.
17 A.   Yeah, I see it.  I said, "I talk to him every day."  And
18 it's been two years.  I mean, if I said that two years ago,
19 then I did talk to him every day.
20 Q.   And it goes on to say "in the morning and in the
21 afternoons."  Is that fair?
22 A.   Yeah.  At lunch time when we went to lunch at 12:00 noon,
23 he would usually come over to the pharmacy and say, "We're
24 through with all the patients."  Yeah, I talked to him every
25 day.

1  Q.   And then you also were asked in that hearing, if you'll
2  look on line 17 and follow along, "So Dr. Ahmad's filling out
3  97 percent of the scripts he filled by United Pharmacy.  Sir,
4  are you aware that DEA has indicated that diversion is possibly
5  occurring when one practitioner is writing a disproportionate
6  amount of scripts for a pharmacy?"  And what was your answer at
7  that time?
8  A.   I said, "It's possible."
9  Q.   And then he asked, "Are you aware that DEA has stated
10 that?"  And your answer?
11 A.   "Yes, the DEA has stated that."  When they say they stated
12 that, were they accusing him of doing it, or they are asking me
13 is it possible for one doctor to write a disproportionate
14 amount of prescriptions for diversion?
15 Q.   You agreed it was possible, correct?
16 A.   Yes, it's possible.  Yeah.  If you get -- it's possible.
17 But the prescriptions I saw, they were not being diverted.
18 They come -- the ones that came to the pharmacy.
19 Q.   And you were there for the inspection of the pharmacy on
20 April -- in April 2013, correct?
21 A.   I think that a relief pharmacist was there that day,
22 Robert Lewis.  He signed off on it April '13.
23 Q.   On April 17th of 2013 when the DEA inspected, you were not
24 there?
25 A.   I was there -- I don't remember what date it was.  I was

1  there and they took out -- took a sample of about ten or 15 of
2  the controlled substances and counted them right there when I
3  was there.  I'm sorry.  The thing with Robert Lewis was a
4  yearly inventory, I think.  He was -- somebody counted around
5  April with his name on it.
6  Q.   Was there an inspection of United Pharmacy on April 17th,
7  2013, by the DEA?
8  A.   Yes.
9  Q.   And that was conducted by Kendall Shortway?
10 A.   Yes, and I was there.  I didn't know the dates.
11 Q.   Okay.  And would you agree that you signed off on the
12 initial and closing inventories with those investigators?
13 A.   Yes.
14 Q.   And when they counted the pills, they counted them several
15 times and you participated.  Is that fair?
16 A.   Yes, they counted on a machine.
17 Q.   And as a result of that inspection and audit, they found
18 violations, is that correct?
19 A.   I was told that, but --
20 Q.   You met with them later after that audit, right?
21 A.   Yes.  Nothing was mentioned about no 4,000 hydrocodone
22 short though.
23 Q.   Did they -- did they explain to you that there were
24 shortages and overages?
25 A.   Yes.  They said some were over and some were under.

1          MS. DEMPSEY:  Nothing further.
2          MR. DUDLEY:  No redirect, Your Honor.
3          THE COURT:  You can step down, sir.
4     [End of excerpt.]
5                    C E R T I F I C A T E
6     I, Judith A. Ammons, Official Court Reporter, do hereby
7 certify that the foregoing is a true and correct transcript of
8 testimony excerpted from the proceedings held on April 24,
9 2017.
10
11
12 /s/ Judith A. Ammons, RPR, CRR, CCR    Date: July 13, 2017
        United States Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25

                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter