1           IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                   WESTERN DIVISION

3    UNITED STATES OF AMERICA,
              Plaintiff,
4        v.                          No. 4:15CV00181 JM

5                                    April 24, 2017
     UNITED PAIN CARE, LTD.          Little Rock, Arkansas
6    d/b/a UNITED PHARMACY
     and MAHMOOD AHMAD, M.D.,
7            Defendants,
         v.
8
     PAMELA HASTINGS WEST and
9    ALBERT RINCHUSO,
              Third-Party Defendants.
10
                 **EXCERPTED TRANSCRIPT OF TRIAL**
11               **[TESTIMONY OF KENDALL SHORTWAY]**
              BEFORE THE HONORABLE JAMES M. MOODY JR.,
12            UNITED STATES DISTRICT JUDGE, and a jury

13   APPEARANCES:

14   On Behalf of the Government:

15       MS. JAMIE GOSS DEMPSEY, Assistant U.S. Attorney
         MS. SHANNON S. SMITH, Assistant U.S. Attorney
16         United States Attorney's Office
           Eastern District of Arkansas
17         425 West Capitol Avenue, Suite 500
           Post Office Box 1229
18         Little Rock, Arkansas  72203-1229

19

20   On Behalf of the Defendants:

21       MR. TIMOTHY O. DUDLEY, Attorney at Law
           114 South Pulaski Street
22         Little Rock, Arkansas  72201

23

24

25        Proceedings reported by machine stenography; transcript
     prepared utilizing computer-aided transcription.


                 Judith A. Ammons, RPR, CRR, CCR
                   United States Court Reporter

1     [Testimony of Kendall Shortway excerpted from jury trial

2     proceedings held on April 24, 2017, as follows:]

3          THE COURT:  Everyone be seated, please.

4     You may call your next witness.

5          MS. SMITH:  Kendall Shortway.

6          THE COURT:  Right up here, ma'am.

7     **KENDALL SHORTWAY, GOVERNMENT'S WITNESS, DULY SWORN**

8          THE COURT:  Have a seat, please.

9                    DIRECT EXAMINATION

10    BY MS. SMITH:

11    Q.   Good afternoon, Ms. Shortway.

12    A.   Good afternoon.

13    Q.   I'm going to be moving back and forth between these two

14    microphones because I have quite a few exhibits, but if you

15    would please introduce yourself to the jury.

16    A.   My name is Kendall Shortway.

17    Q.   And you were formerly with the U.S. Drug Enforcement

18    Administration, correct?

19    A.   Correct.

20    Q.   And you are now -- you graduated from law school, are now

21    a practicing attorney?

22    A.   Correct.

23    Q.   And how long were you with DEA?

24    A.   Just about four years.

25    Q.   Was that August of 2012 through June 2016?

Shortway - Direct

1    A.    Yes.

2    Q.    And in what capacity were you employed with DEA?

3    A.    I was a DEA diversion investigator.

4    Q.    And just real simply, what does a diversion investigator

5    do?

6    A.    A diversion investigator conducts regulatory and criminal

7    investigations into controlled substance licensing or DEA

8    registrations.

9    Q.    And did you do training in order to be a diversion

10   investigator?

11   A.    Yes.  We spend three months in Quantico at the DEA

12   training facility.

13   Q.    And what sort of things do you learn there?

14   A.    You learn how to conduct the inspections, how to do the

15   audits about the Controlled Substances Act and the regulations.

16   Q.    And what is the purpose of these inspections?

17   A.    To -- really to keep compliance with the CSA and the

18   regulations and to teach the registrants how to do it right.

19   Q.    When you say CSA, is that the Controlled Substances Act?

20   A.    Yes.

21   Q.    Okay.  And while you were with DEA as a diversion

22   investigator, did you lead up an investigation into United Pain

23   Pharmacy, which is owned by Dr. Ahmad?

24   A.    Yes.

25   Q.    And when we talk about diversion, what -- why is it

1  important that you all do what you do for diversion prevention?

2  A.   It's important to keep controlled substances or drugs in

3  the places that they are supposed to be, in that closed system,

4  so that you can prevent abuse.

5  Q.   And when you say controlled substances, it's Schedule I

6  all the way down to V?

7  A.   Schedule, yes.

8  Q.   And on April 17 of 2013, did you -- is that the date you

9  conducted the investigation of United Pharmacy?

10  A.   I'm sorry.

11  Q.   April 17 of 2013.

12  A.   Yes, ma'am.

13  Q.   Was that the date you conducted the investigation?

14  A.   Yes.

15  Q.   And why did you all conduct an investigation of that

16  pharmacy?

17  A.   In, I guess, early 2000- -- maybe late 2012, early 2013,

18  we had gotten some complaints about overprescribing by Dr.

19  Ahmad.  So we conducted -- he was therefore put on a work plan.

20  We get a work plan every year where a percentage of the

21  registrants across Arkansas are put on there, and then we

22  conduct surprise inspections on whoever is on the work plan.

23  Q.   Let me back up.  So what was -- what did Dr. Ahmad do?

24  What's his practice?

25  A.   The specific registration was for Suboxone.

1    Q.    And this is for his medical practice?

2    A.    Correct.

3    Q.    And what is Suboxone?

4    A.    Suboxone is a treatment for opioid addiction.  It's also a

5    pill.  But it's used to help wean people off when they are

6    addicted to opiates.

7    Q.    Okay.  So you're talking about the Suboxone.  Then go from

8    there, please.

9    A.    So we conducted the inspection, the surprise inspection,

10   in January of 2013.

11   Q.    Of his medical practice?

12   A.    Of that Suboxone registration.  And, coincidentally, the

13   morning that we showed up there was a break-in at the pharmacy

14   that's in the same building with Dr. Ahmad's practice.  So they

15   asked us to go and look at the break-in because the break-in --

16   it was pretty serious.  Somebody drilled a hole through the

17   side of the wall.

18         So we did like a cursory -- looked at it, told them the

19   proper records to fill out as a result of the break-in and what

20   they needed to do.  And then probably about three -- so we

21   conducted that inspection of just the Suboxone, just walked

22   through the pharmacy, did not conduct an inspection of the

23   pharmacy at that time.

24   Q.    And you said that the pharmacy was right next door to the

25   medical practice?

1    A.    Really not even next door; in the same building.

2    Q.    In the same building.  And when you say you indicated what

3    records they needed to fill out for the break-in, what's that

4    for?

5    A.    It's a DEA-104, theft and loss.

6    Q.    A theft and loss report.  Okay.  Go ahead, please.

7    A.    So then maybe about six weeks after that I got a call from

8    an attorney who worked for Cardinal Health, who was United

9    Pharmacy's drug distributor, their controlled substance

10   distributor.

11         And the attorney indicated that --

12         MR. DUDLEY:  Your Honor, I'm going to object to what

13   the attorney indicated or said.

14         MS. SMITH:  And I assume it's for hearsay?

15         THE COURT:  Sustained -- I'm sorry.  This is my lunch,

16   and he objected right as soon as I put something in my mouth.

17         Appreciate that, Mr. Dudley.

18         I'm sorry.  What?

19         MS. SMITH:  Can I respond to his objection?  Would

20   that be --

21         THE COURT:  You may.

22         MS. SMITH:  It is not for the truth of the matter

23   asserted.  It's simply to show why they actually ended up doing

24   the audit of the pharmacy.

25         THE COURT:  I think it's sufficient to say that an

1    attorney called and that they did an investigation.

2              MS. SMITH:  Okay.

3              THE COURT:  It's still sustained.

4    BY MS. SMITH:

5    Q.   Please continue.

6    A.   So as a result of --

7    Q.   So you received a phone call from an attorney, and as a

8    result of that phone call what did you all do?

9    A.   We decided that we would go inspect the United Pharmacy.

10   Q.   Okay.

11   A.   So we -- same as we always do, it's a surprise inspection.

12   So we showed up on April 17 and conducted an inspection of the

13   pharmacy.

14   Q.   Okay.  And the dates -- you went all the way back to

15   January 27th of 2012?

16   A.   Correct.

17   Q.   So the dates were inclusive in that time frame, correct?

18   A.   Correct.

19   Q.   And who owned the pharmacy during that time frame?

20   A.   Dr. Mahmood Ahmad.

21   Q.   Okay.  And I'm going to show you what I have marked as

22   United States Exhibit 1.  Can you see that on the screen?

23   A.   Yes.

24   Q.   And did you pull this information as part of your

25   investigation?

1    A.    Yes.

2    Q.    And who does it show is the registered agent for -- first

3    of all, what is the corporation name?

4    A.    The corporation name is United Pain Care, and the

5    fictitious name is United Pharmacy.

6    Q.    And who was the registered agent?

7    A.    Dr. Mahmood Ahmad.

8    Q.    And who -- as the officers, who is the incorporator and

9    organizer?

10   A.    Mahmood Ahmad.

11         MS. SMITH:  And, Your Honor, I believe this has been

12   admitted.

13         THE COURT:  Yes, 1 through 6 has, and 11 through 16.

14         MS. SMITH:  Thank you, Your Honor.

15   BY MS. SMITH:

16   Q.    And also I'm going to show you what has been marked as

17   United States Exhibit 2.  Can you -- this is a CS -- can you

18   tell the jury what this is?

19   A.    That is essentially the DEA application.

20   Q.    Okay.  And tell me what a DEA application -- what

21   relevance is that?

22   A.    That is what is submitted in order to get a DEA

23   registration.

24   Q.    Okay.  And can you tell the date which the registration

25   was done?  Let me highlight that.  What date is this?

1    A.    May 28th, 2010.

2    Q.    And this whoever -- the cert name, is that the person

3    certifying the application?

4    A.    Yes.

5    Q.    And what name is that?

6    A.    Mahmood Ahmad.

7    Q.    And the mailing address?

8    A.    7481 Warden Road.

9    Q.    And that's in Sherwood?

10   A.    Yes.

11   Q.    And so what is the significance of the registrant?  That's

12   the person who has -- tell me what the significance of the

13   registrant is.

14   A.    The registrant is the person who is ultimately responsible

15   for the pharmacy, the recordkeeping, everything.

16   Q.    Okay.  And have you also reviewed the application for --

17   to open the pharmacy that was done by Dr. Ahmad?

18   A.    Yes.

19        MS. SMITH:  And, Your Honor, I have Defense Exhibit --

20   I don't know what he numbered it, but we'll see real quick.

21        THE COURT:  What is it, and I might be able to help

22   you?

23        MS. SMITH:  I believe it is Exhibit 5.

24        THE COURT:  Application for permit?

25        MS. SMITH:  Yes, sir.

1        THE COURT:  Yeah, that's what I have, and it's been

2   received.

3        MS. SMITH:  We did not object to it.

4   BY MS. SMITH:

5   Q.   So I'm going to show you -- in reviewing this, is this the

6   application for a permit to operate as an Arkansas pharmacy?

7   A.   Yes.

8   Q.   And what is the -- what's the business name?

9   A.   United Pain Care.

10  Q.   And as far as the address, what is the address?

11  A.   7481 Warden Road in Sherwood.

12  Q.   And I'm turning to page 2 and then 3.  And down at the

13  bottom of page 3, it says, "Please provide the name and address

14  of the owner of this company."  And who is listed there?

15  A.   Dr. Mahmood Ahmad.

16  Q.   And on page 4 of the application, it says, "Please provide

17  the names and titles of the officers or directors."  And who is

18  listed as the president?

19  A.   Mahmood Ahmad.

20  Q.   Do you know who any of these other three individuals are

21  that are the vice president, secretary, or treasurer?

22  A.   I believe the secretary was the nurse in Dr. Ahmad's

23  office.

24  Q.   Do you know who the other two are?

25  A.   I do not.

1    Q.   Anybody you dealt with at the pharmacy at all?

2    A.   No.

3    Q.   And then as far as -- on page 6 of the application, there

4    is a certification here.  And whose signature is that that is

5    certifying the information?

6    A.   Dr. Mahmood Ahmad.

7    Q.   And what position is he?

8    A.   The president.

9    Q.   And what date was this signed?

10   A.   January 26th, 2010.

11   Q.   And is it your understanding that is the application

12   that's needed to open a pharmacy?

13   A.   Yes.

14   Q.   So when we talk about the inspection and the audits, can

15   you sort of give the jury a little bit of an overview how those

16   work when you go in?

17   A.   Sure.  We -- so it's always a surprise inspection.  So we

18   show up that morning.  We tell -- we show our credentials and

19   tell them why we're there.  We present them with a notice of

20   inspection, and it basically says, you have the right to deny

21   us entry.  If you do, we'll go and get a warrant.  But more

22   often than not, they sign the notice of inspection and then we

23   continue with the inspection.

24   Q.   And did that happen here?

25   A.   It did.

Shortway - Direct

1   Q.   Okay.  Go ahead.

2   A.   And then we asked for all of the records, so invoices, all

3   of the receiving records, which are invoices and 222 forms.

4   And then we get dispensing records, which would be a dispensing

5   printout from their computer system, and then also

6   prescriptions.  And then we take an actual count and, I guess,

7   an inventory of a certain number of drugs or controlled

8   substances.

9   Q.   And when you arrive, do you ask to speak to anybody

10  specifically when you get to the inspection?

11  A.   We -- we generally ask to speak to the pharmacist-in-

12  charge, and then if there's an owner, we also ask to speak with

13  the owner.

14  Q.   Okay.  And so you mentioned you sort of look at all the

15  different paperwork.  And so do you look at what's called a

16  biennial inventory?

17  A.   Yes.

18  Q.   And what is that?

19  A.   Every DEA registrant is required to take an actual

20  physical count of everything that they have on-hand that is a

21  controlled substance every two years.  And they have to fill

22  out an inventory and maintain that on-hand.

23  Q.   Okay.  And did you receive this information at this

24  pharmacy?

25  A.   Yes.

Shortway - Direct

1   Q.   And then you said you take a beginning of business

2   inventory and you count the drugs.  So tell the jury how do you

3   decide which drugs to look at?

4   A.   Generally, we always pick the drugs who are -- have the

5   most potential for abuse.

6   Q.   Okay.  And does the pharmacy remain open while you all are

7   there?

8   A.   It does not.  We generally close it until we finish the

9   count.  And then once we finish the count, then it can reopen.

10  Q.   Do you just count the drugs one time, or how many times do

11  you count them?

12  A.   Well, we always count the drugs with the pharmacist, and

13  then we generally have a couple of -- we go out with more than

14  one person from DEA.  So everything is counted multiple times.

15  Q.   Okay.  And then you said you look at all of the drugs that

16  come into the pharmacy.  And explain what indicates what's come

17  in.

18  A.   So the records that we look at are invoices or 222 forms.

19  If they are ordering a Schedule II controlled substance, it has

20  to be on a DEA-222 form.  Anything else can just be on an

21  invoice, which could really look like anything as long as it

22  has certain information on it.

23  Q.   Like if I order plumbing parts, I get an invoice,

24  something like that?

25  A.   Correct.

1    Q.   Just what we all think of as an invoice?  Okay.  So do you

2    think it would assist the jury if they saw a blank DEA-222 form

3    so you could just sort of the explain what it is?

4            MS. SMITH:  I'll show defense real quick.

5        May I approach the witness, Your Honor?

6    BY MS. SMITH:

7    Q.   Ms. Shortway, if you'll just kind of explain what that

8    form is for the jury.

9    A.   So this is --

10   Q.   Do you mind holding it up?

11   A.   Yes.  Sorry.  So this is what a DEA-222 form looks like.

12   And it's a triplicate form, so it gets filled out -- whoever is

13   ordering the controlled substance fills this out.  And they

14   will put who the distributor is.  So that's the person that

15   this is to.  So if it was Cardinal Health, they would put

16   Cardinal Health's information, their DEA number, and then they

17   would fill out what they needed to purchase.  So they would put

18   the number of packages, the size of the package, and what the

19   drug is that they are ordering.  Everything else at that point

20   is left blank.  It comes preprinted, so it's always going to

21   have the name and address of the registrant and the DEA number

22   of the registrant on the bottom.

23   Q.   And those have been marked out, correct, for these

24   purposes?

25   A.   Yes, that's been redacted.

Shortway - Direct

1    So they would send this 222 form off to the distributor.

2    And then the distributor is going to keep one of -- the top

3    copy for themselves, because that's a required record that they

4    have to keep of things going out.  And they are going to

5    indicate the packages that were shipped, because sometimes a

6    pharmacy may order things and they don't have them in stock, so

7    they put, packages shipped, 0, if they didn't ship anything, or

8    if they shipped all of them, it will be indicated, and then the

9    date that they shipped them out.  So --

10   Q.   You can tear it apart.  I just kept it together before you

11   got in here.

12   A.   So then the green copy gets sent to DEA.  And then the

13   blue copy is what is kept on-hand by the pharmacy.  So then the

14   pharmacy -- their side is a little different.  It says the

15   number of packages received and the date it was received so

16   that we -- they can indicate either they had everything and we

17   got everything that we ordered, or they only had a partial

18   fulfillment of our order so we didn't get some of it, I guess.

19   Q.   So there's a specific space to put that information?

20   A.   Yes.

21   Q.   And as far as a DEA-222, is that considered an order form?

22   A.   Yes.

23   Q.   Okay.  And then we talked about -- and the DEA-222s are

24   applicable to which schedule controlled substances?

25   A.   Schedule II.

1  Q.   So any controlled substance that is a Schedule II, you

2  must have a DEA-222?

3  A.   Correct.

4  Q.   So lots of 2s?

5  A.   Yes.

6  Q.   And then for the invoices, that would apply to which

7  schedule drugs?

8  A.   III through V.

9  Q.   And then -- you talked about that's the drugs that come

10  into the pharmacy, and then you said you get paperwork for the

11  drugs that go out, and that would be the dispensing records, is

12  that correct?

13  A.   That's correct.

14  Q.   And who provides those to you?

15  A.   Whoever the pharmacist is in charge, or sometimes the

16  owner will do it as well.

17  Q.   Okay.  And then you also said you looked at some

18  prescriptions, is that correct?

19  A.   Yes.

20  Q.   Like actual written -- like when I go to the doctor and I

21  get a prescription, those, correct?

22  A.   Yes.

23  Q.   And then do you just get all of that paperwork together

24  and the counts and come up with a calculation?

25  A.   Yes.  So we let -- we have the pharmacist give us the

1    biennial inventory and all of the invoices and 222s that they

2    have from what they've ordered.  And then we start the count of

3    everything that's on-hand.  And then while we are looking over

4    all of the paperwork after we finish the count, then the

5    pharmacist will go and create a dispensing record.

6    Q.    Okay.  And so let's talk about the specific audit that you

7    did at United Pain.  So -- would you like some water?

8    A.    I'm okay.  Thank you.

9    Q.    If you change your mind.

10         I'm going to show you what has been marked as Government's

11   Exhibit 3.  And can you explain to the jury -- let me zoom a

12   little bit -- explain to the jury what this is.

13   A.    That is the initial inventory.  So all of those numbers

14   are taken from the pharmacy's biennial inventory.  And that

15   would have been taken on January 27th, 2012.  And so we just

16   take their numbers from their biennial inventory and put them,

17   and that is the initial inventory.

18   Q.    And who was present on the day that you showed up for the

19   investigation as far as the pharmacy is concerned?

20   A.    Albert Rinchuso and then Dr. Ahmad.

21   Q.    Okay.  And so this is the initial inventory, the biennial.

22   So this is sort of your starting point, is that correct?

23   A.    Correct.

24   Q.    And you chose which drugs to audit?

25   A.    So we chose 11 drugs to audit.  The first one is

1    alprazolam, which is also Xanax.  Xanax is the brand name.  And

2    then midazolam, which is Versed.  It's a benzodiazepine used

3    for anxiety.  It can be used before surgeries to calm people

4    down, that kind of thing.  Alprazolam, just a different

5    strength, is also Xanax.  And then there's hydrocodone and

6    oxycodone of various strengths.  Buprenorphine, which is

7    Suboxone.  Lorazepam, which is Ativan, also used -- it's a

8    benzodiazepine used for anxiety and to calm people down before

9    surgeries.  Lyrica is a pain medicine, and then -- and that's a

10    brand name.  And then carisoprodol is Soma, which is a muscle

11    relaxer.

12    Q.   And in this column it notes the different schedules of the

13    drugs, so a IV, II, III, on down, correct?

14    A.   Yes.

15    Q.   And why did -- you picked a variety of drugs.  Why this

16    particular variety of drugs?

17    A.   We -- generally we pick the drugs that have the highest

18    potential for diversion or abuse.  And that generally is the

19    fastest movers out of a pharmacy.

20    Q.   Okay.  And you also on the -- you talked about the

21    different strengths, so .5 milligrams or 2 milligrams.  On the

22    oxycodone and the hydrocodone, it has a milligram amount,

23    slash, and then a number.  What does that represent?

24    A.   So the first milligram amount is the amount of hydrocodone

25    or oxycodone in the tablet.  And then the second amount will

1    either be Tylenol, ibuprofen, aspirin, a mix, because it makes

2    it harder -- when they mix those pills, it makes it harder for

3    them to be melted down.

4    Q.    And are these drugs ever taken together?

5    A.    Yes.  So generally a Xanax, a hydrocodone or an oxycodone

6    painkiller, opiate-based painkiller, and then a muscle relaxer

7    such as Soma, is called a cocktail.  Basically all of those

8    three drugs taken together heighten all of the effects.

9    Q.    Okay.  I'm now going to show you what has been marked as

10   Government's Exhibit 4, and what is this document?

11   A.    That is our closing inventory.  So that is what we

12   actually counted the day of the inspection.

13   Q.    Okay.  And so like the pill count that you do?

14   A.    Yes.

15   Q.    And you said you counted the pills multiple times,

16   correct?

17   A.    Correct.

18   Q.    All right.  And then I have Exhibit 5, which is actually

19   two pieces of paper, so I'll start with the first one.  What

20   does Exhibit 5, page 1, show?

21   A.    When we are looking at all of the different receiving

22   records or dispensing records, there are a lot of them, so we

23   take them and put them in a smaller chart form so it's easier

24   to add them up.  So this depicts all of the receiving records,

25   so all of their invoices and their 222s.

Shortway - Direct

1    Q.    Okay.  And then page 2 also reflects the same information?

2    A.    Yes.

3    Q.    Okay.  Just different -- I note that the drugs are at the

4    top, is that correct?

5    A.    Yes.

6    Q.    So it's a column for each drug?

7    A.    Correct.

8    Q.    And then you also have another sheet, Exhibit --

9    Government's Exhibit 6, it's also two pages.  And what does

10   page 1 represent?

11   A.    Those are the dispensing records just put in a chart form

12   so it's easier to add them up.

13   Q.    And same for page 2?  Just more --

14   A.    Same.

15   Q.    And that is all the drugs that supposedly went out at the

16   pharmacy?

17   A.    Correct.

18   Q.    And I have Government's Exhibit 7.  I believe you

19   testified earlier that there had been a break-in at the

20   pharmacy, is that correct?

21   A.    Correct.

22   Q.    And you -- there was a form that they needed to fill out?

23   A.    Correct.

24   Q.    I am going to show you what has been marked as

25   Government's Exhibit 7.  Do you recognize that?

Shortway - Direct

1    A.    Yes.

2    Q.    And what is Government's Exhibit 7?

3    A.    This is the form that's submitted to DEA after there's a

4    theft or a loss at a pharmacy or any DEA registration.

5    Q.    And is that also part of your calculations?

6    A.    Yes, because those pills are missing, so that's how that

7    they are able to account for where they went.

8    Q.    Okay.  And so down at the bottom, does that list

9    medications that were taken or --

10   A.    Yes.

11   Q.    -- missing?  And then as to page 2 --

12             THE COURT:  Ms. Smith, we may need to pull that.  That

13   has not been admitted.

14             MS. SMITH:  I'm sorry.  I move to Exhibit 7.

15             MR. DUDLEY:  No objection.

16             THE COURT:  7 will be received.

17             MS. SMITH:  I apologize.

18        (Government's Exhibit 7 received in evidence.)

19   BY MS. SMITH:

20   Q.    As to the second page, does that also list the drugs that

21   were taken during the theft?

22   A.    Yes.

23   Q.    And, again, used in your calculations?

24   A.    Yes.

25             MS. SMITH:  I also have what's been marked as

1    Government's Exhibit 8.  May I just approach the witness so she

2    can explain it, Your Honor?

3         Any objections?

4             MR. DUDLEY:  Can I see it?

5         (Off the record.)

6    BY MS. SMITH:

7    Q.   All right.  Ms. Shortway, I'm going to put on here --

8    oops -- Government's Exhibit 8.  And what is this?

9    A.   This is our computation chart.  So we take all of those

10   pieces of paper and add all of the numbers up and then this is

11   how we decide what the pharmacy can account for.

12   Q.   Okay.  And so what is the initial inventory date?

13   A.   The initial inventory date is January 27th, 2012.

14   Q.   And the closing inventory date?

15   A.   Is April 17th, 2013.

16   Q.   And that was the date that you all actually went to the

17   pharmacy, correct?

18   A.   Correct.

19   Q.   And so the initial inventory was reflected in the first

20   chart that I showed you, is that correct?

21   A.   Correct.

22   Q.   And then the amount received again is what?

23   A.   All of the -- so the charts that we were looking at

24   before --

25   Q.   Yes, ma'am.

1    A.   -- that's everything added up --

2    Q.   The --

3    A.   -- from the invoices and the 222 forms.

4    Q.   And then total accountable, what would that be?

5    A.   That's everything that the pharmacy either had on-hand at

6    the beginning or ordered.  So that's how much they have to

7    account for.

8    Q.   Okay.  And then the closing inventory?

9    A.   That -- those are the numbers that we took the day of the

10   inspection.

11   Q.   And then quantity assigned, what is that?

12   A.   That's what has gone out of the pharmacy dispensed based

13   on prescriptions through the course of the audit period, I

14   guess.

15   Q.   Okay.  And then total accounted for?

16   A.   That is how much they can account for.  That's how much

17   they have paperwork to prove went out of the pharmacy.

18   Q.   So this is everything that is in.  And this is everything

19   that went out.  Correct?

20   A.   Correct.

21   Q.   And then what is the difference?  How do you get to that?

22   A.   The difference is the total accounted for minus the total

23   accounted -- the total accountable --

24   Q.   So --

25   A.   -- how many they actually can prove that they had and went

1   out versus how many -- minus how many they were supposed to be

2   able to prove.

3   Q.   And then what is this percentage?

4   A.   That's the percentage that they were off.

5   Q.   Okay.  And so you audited, it looks like, 11 drugs here?

6   A.   Yes.

7   Q.   And how many of those drugs were off?

8   A.   Ten.

9   Q.   Would each of those count as a violation?

10  A.   Yes.

11  Q.   And when we look at hydrocodone 7.5/500, the difference

12  here is what?

13  A.   The pharmacy was missing over 4,000 pills.

14  Q.   And is that concerning?

15  A.   Yes.

16  Q.   And why?

17  A.   Because if we don't know where those are, that means that

18  they are likely on the street.

19  Q.   And do you know what the street value of those would be?

20  A.   It would be about $28,000.

21  Q.   And the remaining, other than the zero, so the 10 out of

22  11 -- the remaining numbers show that there was an overage, so

23  what does that indicate?

24  A.   An overage is impossible.  You can't have dispensed more

25  than what you've bought.  So there's something wrong with their

1    recordkeeping.  They are not doing -- they are not keeping the

2    right records or they are doing something wrong so that they

3    can't balance.

4    Q.    Okay.  So it's like a checking account.  You can't have

5    more money than --

6    A.    Correct.

7    Q.    -- what you have?  Okay.  And so from your perspective as

8    an investigator, were these results significant?

9    A.    Yes.  A pharmacy should be able to be almost exactly --

10    they should be able to -- the one balanced perfectly.  All of

11    them should be.  There might be one that's one off or two off

12    because of a broken pill or something like that, but, generally

13    speaking, they should all balance perfectly.

14    Q.    And based on these results -- you talked about you go in

15    to oversee these, but do you have any other reasons that you go

16    in to do these audits?  To help them out or educate them?

17    A.    Really, our purpose working for DEA is to teach people

18    about the regulations and help them do it right.  We do these

19    inspections to show them -- even though they are responsible

20    for knowing before we get there, sometimes that's not the case,

21    so we always want to try to help them do it right.

22    Q.    And based on this audit, did you all obtain some

23    additional records and do a second audit?

24    A.    We did.

25    Q.    And I have Government's Exhibit 9.

1          MS. SMITH:  Any objection?

2          MR. DUDLEY:  No objection.

3          MS. SMITH:  Mr. Dudley doesn't have an objection, so I

4     move to admit 9.

5          THE COURT:  Government's 9 will be received.

6       (Government's Exhibit 9 received in evidence.)

7  BY MS. SMITH:

8  Q.   And this is also a computation chart, but what's different

9  about this one?

10 A.   So when a pharmacy has -- they're off by so much, we will

11 go to the distributors that they order from and we will ask for

12 the distributors' records on the chance that they are not

13 keeping the records that they are supposed to, and to see if it

14 will help their numbers balance better if we have the records

15 from the distributor, because we know that the distributors are

16 keeping all of the records, based on the orders.

17 Q.   And so you did this to maybe help some of the numbers

18 improve, is that correct?

19 A.   Correct.

20 Q.   And based on your computations -- and I'll lay this up

21 here comparatively 8 to 9 -- what were the results once you

22 obtained the distributor records?

23 A.   Only -- I believe only one of them improved.

24 Q.   Uh-huh.

25 A.   Most of them stayed the same and --

1   Q.   Did four of the five get --

2   A.   Or get worse.

3   Q.   -- get worse?

4   A.   Yeah.

5   Q.   So getting the distributor records, but for one drug,

6   didn't really help the pharmacy out?

7   A.   Did not help.

8   Q.   And then at the close of these inspections, when you sort

9   of obtained all of your results and you've gotten everything

10  completed, what do you generally do at that point?

11  A.   So we ask to speak to the pharmacist in charge, and then

12  we also ask to speak to the owner, and we have a discussion

13  with management where we go over everything that we found in

14  the pharmacy that was wrong.

15  Q.   Okay.  And did that happen here?

16  A.   Yes.

17  Q.   And who was -- when you asked to speak with management,

18  who showed up?

19  A.   Dr. Mahmood Ahmad and Albert Rinchuso.

20  Q.   And for the jury's information, Mr. Rinchuso was the

21  pharmacist at the time?

22  A.   He was the pharmacist.

23  Q.   Okay.  And were the findings discussed?

24  A.   Yes.

25  Q.   And what occurred after that conversation?

1  A.  So based on the findings, Dr. Ahmad asked if we would

2  perform a few extra audits to try to help them pinpoint what

3  was wrong in the pharmacy.

4  Q.  Okay.  And did you perform an audit that was after the

5  April 17th, 2013, date?  And what was --

6  A.  Yes.

7  Q.  And what was that for?

8  A.  We did another -- we did maybe a six-week snapshot after

9  our inspection.  After we went through and taught them how to

10 keep records better and those kinds of things and what they

11 needed to put on all of the invoices, we went back six weeks

12 later, I believe, May 30th.

13 Q.  Okay.  And hold on one moment.

14      MR. DUDLEY:  No objection.

15      MS. SMITH:  No objection from Mr. Dudley.

16   Judge Moody, I would move to admit Government's Exhibit

17 10-B.

18      THE COURT:  10-B, as in bravo?

19      MS. SMITH:  Yes.

20      THE COURT:  10-B will be received.

21      MS. SMITH:  Thank you.

22   (Government's Exhibit 10-B received in evidence.)

23 BY MS. SMITH:

24 Q.  And, Ms. Shortway, what is that?

25 A.  That is the computation chart of the six-week audit.

Shortway - Direct

1    Q.   And the date of this audit was what?

2    A.   So the initial inventory was April 17th, 2013, which was

3    the day we did the previous inspection.  And then the closing

4    inventory was May 30th because we came back in and did our

5    count again.

6    Q.   And so, like I think you said, you did a six-week snapshot

7    at the request of Dr. Ahmad?

8    A.   Correct.

9    Q.   And even with you all being in there and going through

10   everything, what were the results of this audit?

11   A.   This audit, there were still two drugs that didn't

12   balance, and they were missing pills.

13   Q.   Is that reflected with the alprazolam 1-milligram?

14   A.   Yes.

15   Q.   And then the -- I won't be able to pronounce this --

16   carisoprodol?

17   A.   Soma is the --

18   Q.   Okay.  And so then at that point that concluded the audit

19   part, correct?

20   A.   Correct.

21   Q.   All right.  And then you also -- I know that that was on

22   the pill counts and making sure that the controlled substances

23   matched up.  Did you also find some additional findings as to

24   the paperwork?

25   A.   Yes.

1    Q.   And I'm going to show you --

2         (Counsel confer.)

3    BY MS. SMITH:

4    Q.   I'm going to show you what's been marked as Government's

5    Exhibit 11.

6              THE COURT:  It's already been received.

7    BY MS. SMITH:

8    Q.   If you can, show the jury this demonstrative exhibit, the

9    DEA-222.  What is this?

10   A.   This is a copy of the DEA-222.

11   Q.   And that would be, I think you indicated, the blue sheet,

12   the last sheet would be what the pharmacy should have?

13   A.   Yes.

14   Q.   Okay.  And so this is a copy of the blue sheet?

15   A.   Correct.

16   Q.   Okay.  Because it's not color copied, so I just wanted to

17   be clear.  And where did you get this?

18   A.   We got that from United Pharmacy.

19   Q.   And explain to the ladies and gentlemen of the jury the

20   significance of this.

21   A.   So on the side where it says packages received and date

22   received --

23   Q.   Is that right here?

24   A.   Yes.

25   Q.   Okay.

1  A.    There's nothing there.  So we don't know how much they

2  received from their order or when they received it.

3  Q.    Okay.  And you stated that that was something that is

4  supposed to be on the DEA-222, correct?

5  A.    Yes.  It's required.

6  Q.    And when you look at these drugs, what schedule are they?

7  A.    So they are both Schedule II because they are on a 222

8  form.

9  Q.    Okay.  And so that requires this particular form be filled

10 out completely?

11 A.    Correct.

12 Q.    And what was the date this was issued?

13 A.    So that was -- that date is -- the highlighted date is the

14 date that the 222 form itself was issued to the registrant, to

15 the pharmacy.  The date on the top, 12/11/12, is the date they

16 actually ordered it, on the top.

17 Q.    All right.  And then this information is what's missing,

18 correct?

19 A.    Correct.

20 Q.    And what is the address of -- the name and address that's

21 listed there?

22 A.    United Pharmacy, 7481 Warden Road in Sherwood.

23 Q.    Now, let me put this back up here.  So you're required to

24 have a form like this for every Schedule II controlled

25 substance, correct?

Shortway - Direct

1    A.    Correct.

2    Q.    Did you find some instances at the pharmacy where the DEA

3    Form 222s were missing?

4    A.    Yes.

5    Q.    And I'm going to show you what's been marked as

6    Government's Exhibit 12.  Do you recognize that?

7    A.    Yes.

8    Q.    And what is that?

9    A.    That is essentially a packing slip that is put in the box

10   with the controlled substances when they arrive.

11   Q.    Okay.  And what does it indicate?

12   A.    All of those drugs are Schedule II drugs.

13   Q.    Is that reflected in this column right here?

14   A.    Yes, the little C2s.

15   Q.    Okay.  And so did you ask if there was a DEA-222 that

16   accompanied this invoice?

17   A.    Yes.

18   Q.    And what were you told?

19   A.    They didn't have it.

20   Q.    And that is required, correct?

21   A.    It is.

22   Q.    Did that result in a violation?

23   A.    It did.

24   Q.    And I'm going to show you what's been marked as

25   Exhibit 13-A and 13-B.

1      I'll start with 13-A.  And what is this?

2    A.    It's a statement from Gen-Source, which is a distributor,

3    listing invoices and a particular date.

4    Q.    Okay.  And there's a little mark next to this particular

5    document number, correct?

6    A.    Correct.

7    Q.    And now I'm going to show you what's been marked as

8    Exhibit 13-B.  And I'll put these, well, side by side here.

9    Does this document number, is it -- what is 13-B?

10   A.    13-B is what was ordered on those specific invoices that

11   are indicated on the statement.

12   Q.    Okay.  So Invoice PS1-312-319 536 is reflected here, is

13   that correct?

14   A.    That's correct.

15   Q.    And it says what class of drugs are those?

16   A.    Those are all Schedule IIs.

17   Q.    And should a DEA-222 form be accompanied with this?

18   A.    Yes.

19   Q.    Did you ask if there was any DEA-222 forms?

20   A.    Yes.

21   Q.    And were there any?

22   A.    No.

23   Q.    So it was missing?

24   A.    Correct.

25   Q.    Did that result in a violation?

1    A.    It did.

2    Q.    And we discussed all of the -- ten of the 11 drugs that

3    were off.  And that resulted in how many violations?

4    A.    Ten violations.

5    Q.    And then you also looked at invoices, is that correct?

6    A.    That's correct.

7    Q.    And I have what has been collectively marked as

8    Exhibit 14.

9              MS. SMITH:  Did you have any objection to this?

10             MR. DUDLEY:  No.

11             THE COURT:  I think that was received.

12             MS. SMITH:  Sorry.  I misplaced my sticky that said

13   what was admitted and not.

14   BY MS. SMITH:

15   Q.    So do you believe it would assist the jury if there was a

16   chart that they could view to work through these invoices?

17   A.    Yes.

18   Q.    Let me find it.

19             MS. SMITH:  May I have a moment, Your Honor?

20             THE COURT:  Sure.

21             MS. SMITH:  Thank you.

22   BY MS. SMITH:

23   Q.    Okay.  So, Ms. Shortway, we have a group of invoices here

24   which we'll -- I'm not going to go through every one, for the

25   jury's sake, but I am going to highlight a few of them and then

1    we'll talk about the summaries.

2         So I'm going to first show you what has been marked as

3    Exhibit 14-A.  And what is this?

4    A.    That is an invoice from Cardinal Health.

5    Q.    So this is from Cardinal.  And what does it show?

6    A.    It shows orders that were placed by United Pain Care on

7    February 6th, 2012.

8    Q.    So February 6.  And then does -- this shows the order

9    number right here?

10   A.    Correct.

11   Q.    Okay.  And then this is for what schedule drugs?

12   A.    III through Vs.

13   Q.    What's the significance of this invoice for the violation?

14   A.    So every invoice is required, just like the 222 forms, to

15   have the date received and the quantity received.  We don't --

16   Q.    Go ahead.  I'm sorry.

17   A.    From looking at this invoice, we don't know when they

18   received the drugs.

19   Q.    Okay.  Then I'm also going to show you what has been

20   marked as Government's Exhibit 14-B.  And what is this?

21   A.    This is an invoice where United Pain Care bought drugs

22   from East End Pharmacy.

23   Q.    Okay.  And before I go any further, who provided all of

24   these invoices to you?

25   A.    Albert Rinchuso at --

1     THE COURT:  Ms. Smith, let me interrupt you.  Just so

2  we're clear, when I received Exhibit 14, that really meant 14-A

3  through 14-F.

4     MS. SMITH:  Yes.  All of 14, and then I was using

5  summed-up to demonstrate to the jury the different invoices.

6     THE COURT:  I guess, for the record, when I received

7  14 --

8     MS. SMITH:  Yes, sir.

9     THE COURT:  -- 14 was a collective exhibit of 14-A

10  through F.

11     MS. SMITH:  I see what you're saying.  So I need to

12  move to admit --

13     THE COURT:  No.  I just want to make sure we're

14  understanding that 14 isn't just a blank piece of paper, that

15  it actually consists of Exhibits 14-A through F.

16     MS. SMITH:  It's actually all of the invoices.

17     THE COURT:  Which is 14-A, B, through F.

18     MS. SMITH:  Yes, plus -- I have a total of 102, and

19  then I tabbed them out separately just to give the jury an

20  example.

21  BY MS. SMITH:

22  Q.   And so this is from East End -- so this is considered an

23  invoice?

24  A.   Yes.

25  Q.   Okay.  And what is missing here?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    A.    We don't know the date received and we don't know the

2    quantity received.

3    Q.    Okay.  And I'm going to show you what has been marked as

4    Government's Exhibit 14-C.  What is this?

5    A.    That's an invoice from American Specialty Pharmacy to

6    United Pain Care.

7    Q.    Let me go back real quick.  On 14-B, does this include

8    controlled substances Schedules II through V -- III through --

9    A.    III through V.

10   Q.    And I would ask the same of 14-C.  Does it include --

11   A.    Yes.

12   Q.    Okay.  And I'm going to show you Government's Exhibit

13   14-D.  What does this -- is this?

14   A.    That's also an invoice.  And the same problem, we don't

15   know what they received or when they received it.

16   Q.    Also includes Schedules III through V?

17   A.    III through Vs, yes.

18   Q.    Okay.  And I'm going to show you Exhibit 14-E.  And what

19   is this?

20   A.    That is an invoice from S-A-J Distributors to United

21   Pharmacy.

22   Q.    And then it sets forth the controlled substances here?

23   A.    III through Vs.

24   Q.    Okay.

25   A.    And we don't know the quantity that they received or when

1    they received them.

2    Q.    Okay.  And lastly of the invoices, what is this --

3    A.    That is --

4    Q.    -- 14-F?

5    A.    -- an invoice from Gen-Source.  And we don't know the

6    quantity received or when they received them.  And those are

7    III through Vs.

8    Q.    Is this the invoice number up here?

9    A.    That is.

10   Q.    Is this the invoice number on the S-A-J?

11   A.    Yes.

12   Q.    Okay.  And, again, missing the information needed,

13   correct?

14   A.    Correct.

15   Q.    So instead of going through all -- every invoice, would it

16   assist the jury if you had a summary?

17   A.    Yes.

18   Q.    Okay.  So this is a summary chart that I submit is

19   January 27th, 2012, through May 30.  Have you reviewed this

20   chart?

21   A.    Yes.

22   Q.    And does it accurately reflect all the invoices that are

23   contained within Exhibit 14?

24   A.    It does.

25   Q.    And they all have the same issue, correct?

1    A.    Correct.

2    Q.    And how many invoices are there total?

3    A.    There's 102.

4    Q.    And what -- again, what were they missing?

5    A.    All of them were missing the date that the drugs are

6    received.  Most of them were also missing the quantity that was

7    received.

8    Q.    And did all of these invoices result in 102 violations?

9    A.    They did.

10   Q.    You stated that part of what you looked at were

11   prescriptions that were written from physicians.  What

12   physicians wrote prescriptions that were filled at United Pain

13   Pharmacy?

14   A.    Dr. Mahmood Ahmad.

15   Q.    Were there any other physicians writing prescriptions for

16   that pharmacy you observed?

17   A.    There might have been one.

18   Q.    Did you at any point receive any communication from Dr.

19   Ahmad regarding the inspection and audits?

20   A.    I did.

21   Q.    And in what form was that?

22   A.    An email.

23   Q.    Okay.  I'm going to show you what I've marked as

24   Exhibit -- Government's Exhibit 15.  Does this look familiar?

25   A.    It does.

1    Q.   And this -- if you can tell the jury what the date of this

2    email is.

3    A.   Friday, May 24th, 2013.

4    Q.   So that would have been between the first audit and the

5    last audit?

6    A.   Correct.

7    Q.   Okay.  And if you would, for the jury, would you read the

8    highlighted portion of the email?  And, first of all, who is it

9    to --

10   A.   It's to me.

11   Q.   -- and from --

12   A.   It says, "Dear Kendall" -- from Dr. Mahmood Ahmad.

13   Q.   And what does the highlighted portion read?

14   A.   "However, being the owner of the pharmacy, any violations

15   which are assessed against the pharmacy are ultimately

16   applicable to the company (which I own) since the pharmacist is

17   an employee."

18   Q.   And at some point did Dr. Ahmad sell the pharmacy?

19   A.   Yes.

20   Q.   And who was the registrant of the pharmacy?

21   A.   Dr. Ahmad.

22   Q.   Okay.  And did he at some point surrender his DEA

23   registration for the pharmacy?

24   A.   He did.

25   Q.   Did you receive a communication from him on that?

1    A.   I did.

2    Q.   And I'm going to show you what's been marked as

3    Government's Exhibit 16.  Do you recognize that?

4    A.   Yes.

5    Q.   And what is it?

6    A.   That's the letter from Dr. Ahmad surrendering his DEA

7    registration with the required paperwork that we have to have.

8    Q.   Okay.  And so then if the pharmacy was purchased by

9    someone else, would they have to get a different DEA number?

10    A.   Correct.  Yes.

11          MS. SMITH:  May I have just a moment, Your Honor?

12          THE COURT:  Yes.

13          MS. SMITH:  I don't have anything else, and I'll pass

14    the witness.

15          MR. DUDLEY:  Would you mind leaving those exhibits up

16    there that you used with her?

17          MS. SMITH:  Sure.  I can't promise they are in the

18    best order, but --

19          THE COURT:  Do you have an extra copy, or I can give

20    him mine?

21          MS. SMITH:  No.  I've got mine, too, Your Honor.

22    Thank you.

23                     CROSS-EXAMINATION

24    BY MR. DUDLEY:

25    Q.   Good afternoon.

Shortway - Cross

1   A.    Good afternoon.

2   Q.    Did you ever see an order for controlled substances signed

3   by Dr. Ahmad?

4   A.    No.

5   Q.    Did you ever see a receipt where Dr. Ahmad had signed a

6   receipt for controlled substances?

7   A.    No.

8   Q.    Did you ever see any record of controlled substances

9   prepared by Dr. Ahmad?

10  A.    No.

11  Q.    Did you ever see any record where Dr. Ahmad dispensed

12  controlled substances from United Pharmacy?

13  A.    No.

14  Q.    Did you ever see any record where Dr. Ahmad delivered any

15  controlled substances for United Pharmacy?

16  A.    No.

17  Q.    Did you ever see any record where Dr. Ahmad otherwise

18  disposed of controlled substances for United Pharmacy?

19  A.    No.

20  Q.    And I assume in your work for the DEA that you have been

21  in many pharmacies?

22  A.    Yes.

23  Q.    And conducted audits in many pharmacies?

24  A.    Yes.

25  Q.    And in your experience, who normally keeps the records for

1    controlled substances in a pharmacy?

2    A.   It depends.  Generally speaking, it's the

3    pharmacist-in-charge.  Sometimes the owner is the

4    pharmacist-in-charge, and so it's the owner and the

5    pharmacist-in-charge that does it.  So it depends.

6    Q.   All right.  Were your audits mainly done in Arkansas?

7    A.   Yes, and I also did some in St. Thomas.

8    Q.   And during your audits of pharmacies in Arkansas, did you

9    familiarize yourself with Arkansas law regarding pharmacists?

10          MS. SMITH:  I'm going to object, Your Honor.  We're

11   not here on Arkansas law.  We're here on federal law.  And any

12   testimony or questioning as to Arkansas law is irrelevant.

13          THE COURT:  I'm going to let her answer the first

14   question, and then I'll have to deal with the second.  Whether

15   or not she's familiar is one thing.  Whether or not she can

16   talk about it is another.

17       Go ahead, ma'am.  Are you familiar?

18          THE WITNESS:  Some of them.

19   BY MR. DUDLEY:

20   Q.   Okay.  Let me just ask you like this.  Do you know whether

21   anybody other than a pharmacist is allowed to keep the records

22   for controlled substances?

23   A.   No.

24   Q.   You don't know --

25   A.   I don't believe that they are, but I'm not 100 percent

1    sure.

2    Q.   Let me go to where your direct examination kind of ended,

3    if I can find the right exhibits.  I'm going to put up

4    Government's Exhibit 15.  This is the email that Dr. Ahmad sent

5    to you, correct?

6    A.   Correct.

7    Q.   And we can read this whole email, and the jury will have

8    it when they go back to the jury room, but isn't it true that

9    the purpose of this email is to try to explain to you what

10   investigation Dr. Ahmad had done to try to figure out what the

11   problem was and to suggest or search for a solution?

12   A.   Yes.

13   Q.   So Dr. Ahmad was taking your audit seriously?

14   A.   Yes.

15   Q.   And wanted to fix whatever the problems were?

16   A.   Yes.

17   Q.   And you even said he asked for another audit --

18   A.   Right.

19   Q.   -- to try to figure out what was going on so he could fix

20   what the problems are?

21   A.   Correct.

22   Q.   So you're not saying Dr. Ahmad blew it off or didn't take

23   it seriously or didn't care?

24   A.   No.

25   Q.   You said the pharmacy was burglarized in January of 2013?

1    A.   Correct.

2    Q.   And you also said the pharmacy -- actually I think it was

3    Mr. Rinchuso submitted a report to the DEA --

4    A.   Correct.

5    Q.   -- about that burglary?

6    A.   Yes.

7    Q.   And I didn't make a note on what exhibit that was.  Do you

8    remember?

9         MS. SMITH:  7.

10        MR. DUDLEY:   Thank you.

11   BY MR. DUDLEY:

12   Q.   And this is the report?

13   A.   Yes.

14   Q.   And this would have been in the DEA records?

15   A.   Correct.

16   Q.   Okay.  By the way, you said -- or did you say you actually

17   went out to the pharmacy after the burglary?

18   A.   Coincidentally, we were -- we were doing a surprise

19   inspection of Dr. Ahmad's Suboxone registration that morning,

20   and it happened to be that it was the same day that they had a

21   break-in the night before.

22   Q.   And did you actually see how the burglars got in there?

23   A.   Yes.

24   Q.   Tell the jury how that happened.

25   A.   They drilled a hole through the wall from the outside of

1    the pharmacy to get into the pharmacy.

2    Q.   Mr. Rinchuso had to list the drugs that he believed were

3    taken in the burglary, correct?

4    A.   Correct.

5    Q.   And if you look on Exhibit 7, the first entry that he

6    lists there is hydrocodone as -- whatever that is -- 5?

7    A.   That's hydrocodone mixed with Tylenol, and, yes,

8    5-milligram.

9    Q.   And he reported 8,270 pills were taken in the burglary?

10    A.   Correct.

11    Q.   And if we go on through there, there are other

12    hydrocodones, 5,300; Diazepam, 8,700.  I'm rounding off here.

13    We can see the actual numbers.  And then a number of other

14    drugs were taken including more hydrocodone, correct?

15    A.   Correct.

16    Q.   And you said in Exhibit 8, I think -- Exhibit 8 was your

17    computation chart?

18    A.   Correct.

19    Q.   And you told the jury that the pills taken in the burglary

20    were accounted for in the computation chart?

21    A.   Correct.

22    Q.   Where?

23    A.   In the quantity assigned.

24    Q.   Okay.  Tell me what quantity assigned is.

25    A.   Quantity assigned is anything that went out of the

1    pharmacy.  So if it was filled based on a prescription in the

2    dispensing records, or if they have a theft or a loss.

3    Q.   Let's look at hydrocodone 5/500.  Is that the first entry

4    on the theft report that we just looked at?  Do you need me to

5    put that back up to see?

6    A.   Yes.

7    Q.   If you look on the theft report, that first entry is

8    5-milligram/500?

9    A.   It appears to be, yes.

10   Q.   So that would correspond with your entry on the

11   computation chart of hydrocodone 5/500?

12   A.   Correct.

13   Q.   And the quantity assigned is 10,920 pills?

14   A.   Correct.

15   Q.   The theft reported was 8,270 pills?

16   A.   Correct.

17   Q.   So you're saying that pharmacy only actually sold or

18   dispensed -- I'm not very good at math -- but roughly 2,500

19   pills during that period?

20   A.   It seems that would be the case.

21   Q.   All right.  You testified on direct exam that Dr. Ahmad

22   owned the pharmacy?

23   A.   Correct.

24   Q.   Do you know that the pharmacy was actually owned by United

25   Pain Care?

1    A.    Which Dr. Ahmad owns.

2    Q.    All right.  But United Pain Care is a corporation.  You

3    realize that?

4    A.    Okay.  Yes, sir.

5    Q.    And a corporation, you know this from your legal training,

6    is a separate legal entity from an individual?

7    A.    Correct.

8    Q.    True?  So --

9          MS. SMITH:  Your Honor, I mean, I appreciate that

10   Ms. Shortway is an attorney, but I'm not tendering her as an

11   expert in corporate structure, so I would object to any line of

12   questioning where Mr. Dudley is trying to ask in that realm.

13         THE COURT:  So far as it's gone so far, I'm going to

14   let him make the distinction.  He can call her back as his own

15   witness.

16         But go ahead, Mr. Dudley, and let's --

17   BY MR. DUDLEY:

18   Q.    I don't want the jury to be confused.  You agree the

19   pharmacy was owned by United Pain Care?

20   A.    Correct.

21   Q.    Which is a corporation?

22   A.    Correct.

23   Q.    Dr. Ahmad and his wife own the stock of United Pain Care?

24   A.    They own the corporation, correct.

25   Q.    Okay.  Now, I also thought I heard you say that Dr. Ahmad

1    was the registrant for the pharmacy?

2    A.    The pharmacy is the registrant.

3    Q.    Is that the way it's registered in the pharmacy in DEA

4    records?

5    A.    The pharmacy is always the registrant.  If that's owned by

6    a corporation or a person, the registrant is the pharmacy.

7    Q.    Okay.  Let me show you what's been --

8          May I approach?

9          I can put it up here.

10         Let me show you Defendants' Exhibit 1.  Can you tell the

11   jury what that is?

12   A.    That is a copy of the DEA registration.

13   Q.    And who does it show is the registrant?

14   A.    United Pharmacy.

15   Q.    Okay.  So can you show me a piece of paper that shows Dr.

16   Ahmad was the registrant?

17   A.    The pharmacy is the registrant of a pharmacy always.

18   Q.    Okay.  Then you would agree Dr. Ahmad was not the

19   registrant?

20   A.    He owns the company that owns the pharmacy, so he is the

21   registrant.

22   Q.    All right.  Isn't it true that you have a space on DEA

23   forms that says who is the registrant?

24   A.    For a pharmacy, it will always say the pharmacy's name --

25   Q.    Okay.

1   A.   -- because that is the registrant.

2   Q.   And that is the official registrant with the DEA, is it

3   not?

4   A.   Yes.

5   Q.   Is that -- is the registrant the same as who holds the DEA

6   license, or are those separate?

7   A.   It's the same thing.

8   Q.   Same thing?

9   A.   Yes.

10  Q.   So the pharmacy would be the entity that held the DEA

11  license?

12  A.   Correct.

13  Q.   When a pharmacist or whoever fills out a DEA Form 222 -- I

14  think I've got this right -- but one copy of that goes to the

15  DEA?

16  A.   Correct.

17  Q.   And you said there were a couple of DEA Form 222s that

18  were not in the pharmacy?

19  A.   Correct.

20  Q.   Did you check the DEA records to see whether the DEA had

21  their copy of those?

22  A.   No, but that -- they are required to keep it, not the DEA.

23  Q.   I understand.  I'm not arguing with you about that.  I'm

24  just wondering whether you know whether the DEA form wasn't

25  filled out, or whether it was filled out and they lost their

1    copy, whether the DEA had their copy, do you know any of that?

2    A.    Well, when they send them to DEA, they can send them a

3    multitude of places.  They can send them to headquarters, or

4    they can send them to our local office.  There's no necessarily

5    specific place that they have to be sent.  They just have to be

6    sent to DEA.

7    Q.    And I take it from that -- I'm not fussing with you.  I

8    take it from that, the answer to my question is you don't know

9    whether the DEA got their copy?

10   A.    No, I do not.

11   Q.    You also said there were roughly 4,000 hydrocodone pills

12   missing?

13   A.    Correct.

14   Q.    Did you ever talk with Albert Rinchuso about that?

15   A.    We talked to both Albert Rinchuso and Dr. Ahmad.

16   Q.    And did you tell Mr. Rinchuso that you thought there were

17   4,000 hydrocodone pills missing?

18   A.    Yes.

19   Q.    What did he say?

20   A.    I don't recall specifically.  We would have had that

21   conversation in the discussion with management with -- we -- I

22   don't know that we would have said specific numbers.  We

23   usually deal in percentages, because, as soon as you tell

24   somebody you're missing 90 pills, all of a sudden it's like,

25   oh, well, we found another record for 90 pills to show where

1    they went.  So we generally don't speak in specific numbers,

2    just in percentages.

3    Q.    You also said, kind of as an aside, those pills are likely

4    on the street.  Do you remember saying that?

5    A.    Yes.

6    Q.    You don't have any evidence of that whatsoever, do you?

7    A.    Well, if they can't account for them and they don't know

8    where they are, I don't know where else they would be.

9    Q.    Could be lost?

10   A.    You can lose 4,000 hydrocodone pills?

11   Q.    I don't know.

12   A.    I mean, maybe you can.

13   Q.    You cannot identify any specific individual on the street

14   who got any of those pills, can you?

15   A.    No, not specifically.

16   Q.    On the invoices you talked about, as I understand it, the

17   problem with those is the pharmacist didn't say:  I got them on

18   this date and here's how many I got?

19   A.    Correct.

20   Q.    And the reason for that is so the pharmacist can confirm

21   that what he orders is what's actually delivered?

22   A.    Correct.

23   Q.    Now, on those invoices, are copies of those sent to the

24   DEA?

25   A.    No.

1  Q.   So on Schedule III through V, the DEA doesn't get any

2  paperwork from the pharmacy?

3  A.   No.

4  Q.   What about from the distributor?  Do they send you any

5  paperwork on Schedule III through V?

6  A.   The distributor is generally the one that's going to send

7  that green copy to DEA either -- for the 222 forms.  No.  DEA

8  doesn't get any records, paper records like that.

9  Q.   Okay.  And I think I've got this, but let me make sure.  I

10  and II, you use 222s -- I, you don't do 222s because they are

11  not legal, right?

12  A.   You would, but in very limited circumstances, for research

13  or something like that.  Generally speaking, no.

14  Q.   Mainly a Schedule II you do the 222s on?

15  A.   Correct.

16  Q.   And then Schedule III through V, the DEA doesn't get

17  paperwork on?

18  A.   We don't tell them how to do it.  We tell them the things

19  have to be on the invoice.  And then the companies can create

20  their invoices however they want to, as long as that

21  information is on there.

22  Q.   In this case do you know whether Andy Rinchuso or Pamela

23  Hastings actually did look at what they received and match it

24  against the invoice to make sure they got what they ordered?

25  A.   I don't because they didn't fill out the paperwork to tell

1  me.

2  Q.   You don't know whether they did or whether they didn't?

3  A.   No.

4  Q.   Do you know whether or not Mr. Rinchuso kept his

5  controlled substances record in a computer program?

6  A.   I'm not sure I understand.

7  Q.   Well, I don't know enough about computers maybe even to

8  make my question plain.  But did he keep his drug records on a

9  computer?

10  A.   When things are dispensed from a pharmacy, generally, they

11  are kept in a computer-owned software.  You have the hard copy

12  prescriptions that show what's been dispensed, which can be

13  thousands, and then you have the software on the computer where

14  everything is input.

15  Q.   Back to him not confirming the invoice, do you know

16  whether he input the information with the date the drug was

17  received and the quantities received into his computer program?

18  A.   No, but that would be two separate things.

19  Q.   I understand it would be.  I'm just asking, did you ask

20  him that?

21  A.   No.

22  Q.   Did you ever look at his computer records?

23  A.   We did as far as the dispensing, because he printed us out

24  dispensing records.  Everything that went out of the pharmacy,

25  he printed those out for us.

1    Q.   But you didn't look to see whether the information missing

2    from the invoice was actually in his computer records?

3    A.   No.

4    Q.   Thank you.

5         MS. SMITH:   I just have a couple of quick questions.

6                    REDIRECT EXAMINATION

7    BY MS. SMITH:

8    Q.   Ms. Shortway, Mr. Dudley asked you about whether Ms. West

9    and Mr. Rinchuso, the two pharmacists-in-charge during this

10   time frame -- whether you know they did or didn't sign any of

11   this required paperwork.  Do you know if Dr. Ahmad did or

12   didn't sign any of the paperwork?

13   A.   No, I don't.

14   Q.   Why not?

15   A.   Because the paperwork wasn't signed.

16   Q.   Okay.  So we don't really know who may or may not have

17   signed it if --

18   A.   We don't know who checked it in, whether it was checked in

19   or not.  We don't know any of that because the paperwork is not

20   filled out.

21   Q.   So we see checkmarks on several of the invoices and

22   checkmarks on the DEA-222s and checkmarks on some of the

23   invoices that require the DEA-222s, but we have no idea who

24   made those checkmarks?

25   A.   We don't, and we don't really know what they indicate.

1    They may indicate -- a checkmark may say, this is how much I

2    received, but we don't know what it means.

3    Q.   And back to -- I believe Mr. Dudley showed you an exhibit

4    that indicated who the registrant was?

5    A.   Yes.

6    Q.   Okay.  And I showed you initially -- it was Government's

7    Exhibit 2, which was who the registrant was for -- who applied

8    for the registration in May 28 of 2010?

9    A.   Correct.

10   Q.   And who was the certification name?

11   A.   The person that submitted the application was Mahmood

12   Ahmad.

13   Q.   And do you recall reviewing how that payment was made?

14   A.   Yes.

15   Q.   And who made that payment?

16   A.   Dr. Mahmood Ahmad.

17   Q.   That's all I have.

18        MR. DUDLEY:  Nothing further, Your Honor.

19        [Excerpt ended.]

20                    REPORTER'S CERTIFICATE

21       I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24   /s/ Judith A. Ammons, RPR, CRR, CCR   Date: September 18, 2017
         United States Court Reporter

25


                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter